# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DANNY WERTZ,** | : | **Civil No. 1:14-CV-1991** |
| | : | |
| **Plaintiff** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **GEA HEAT EXCHANGERS, INC.,** | : | |
| **PHE DIVISIONS, TRITION** | : | |
| **ADVISORS, LTD., et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This is an employment discrimination and retaliation action brought by Danny Wertz and against his former employer, GEA Heat Exchangers, Inc., and several of its individual supervisory employees.   Wertz alleges that he was unlawfully terminated as a journeyman welder in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the Family Medical Leave Act, 29 U.S.C. §§ 2615 "FMLA"), and parallel provisions of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 951 et seq. ("PHRA").   Wertz alleges that he sought and took FMLA-qualifying leave for chronic irritable bowel syndrome, and he asserts that he has an intellectual disability that limits his reading

ability.  He claims that his employer discriminated against him on the basis of his disabilities in violation of the ADA and PHRA, and that his employer retaliated against him for exercising rights protected under the ADA, FMLA, and PHRA.

The defendants have a different view of what led to Wertz's termination: work performance that was unsatisfactory and a series of outbursts and disruptive behavior that occurred after Wertz was not promoted to a new position he was seeking.  The defendants have moved for summary judgment, arguing that there is insufficient evidence to support Wertz's claims of discrimination and retaliation. More particularly, the defendants maintain that Wertz has failed to come forward with sufficient evidence that could allow a factfinder to conclude that the defendants' proffered reasons for terminating Wertz's employment were pretextual cover for discriminatory or retaliatory animus.

The motion has been fully briefed and referred to the undersigned for purposes of preparing a report and recommendation.  The parties' briefing is extensive, as are the evidentiary materials that the parties have submitted in support of, and opposition to, the motion.  Those evidentiary materials include nearly 1,000 pages of exhibits which the parties read in starkly contrasting ways. Upon consideration of the briefs and review of the evidence that has been submitted, the Court finds that disputed issues of material fact exist regarding the

discrimination and retaliation claims that make summary judgment unwarranted. Accordingly, it will be recommended that the motion be denied.

## II.   **<u>FACTUAL BACKGROUND</u>**[1]

Danny Wertz has worked as a welder since 1995. In July 2007, Wertz applied for work with the York, Pennsylvania facility of GEA Heat Exchangers, Inc., a manufacturer of plate heat exchangers that are used in a variety of industries. Plate heat exchangers are high-pressure vessels that must withstand up to 600 pounds per square inch, or approximately 1.5 million pounds, at any given time. The heat exchangers also must be carefully built because if manufactured improperly that can explode and cause serious injury or death. For these reasons, the heat exchangers are subject to stringent safety standards both in America and Europe. GEA is an equal opportunity employer and prohibits workplace discrimination on the basis of any trait protected by law, including disability. Additionally, GEA maintains an FMLA policy that apprises employees of their rights under the Act and their eligibility for leave. (Pl. and Def. SMF ¶¶1-9.)

When Wertz applied to work with GEA, he submitted a resume that indicated that he held multiple accreditations in welding, including a 1995 accreditation in "welding blueprint." (Def. SMF ¶ 10.) GEA offered Wertz a job

---

[1]  The factual background to this report is taken from the defendants' statement of material facts (Doc. 54), as well as from the plaintiffs' response (Docs. 58, 59.) In cases where the record is in conflict, and there is a genuine dispute regarding a factual assertion, that fact has been interpreted in the light most favorable to the plaintiff as the non-moving party.

in August 2007, which was contingent upon completion of a pre-employment physical exam. (*Id.* ¶ 11.)  Wertz's offer letter also explained that GEA would provide reasonable accommodations in accordance with the ADA, as needed. (*Id.* ¶ 12.)  Wertz began working for GEA in August 2007.  Wertz worked primarily in the brazed welding department.

Throughout his employment with GEA, Wertz was a member of Local 1872 of the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, which in 2008 entered into a collective bargaining agreement ("CBA") with GEA.  The CBA laid out the terms and conditions governing members' employment with GEA, and provided that members could only be terminated "for cause" and that the company would comply with the FMLA and its implementing regulations.  (Parties' SMF ¶¶ 18-23.)

In 2009, Wertz enrolled in an apprenticeship program that GEA began offering to employees as an opportunity for advancement within the company. Completion of the apprenticeship program was not necessary for Wertz to continue as a welder with the company, but it was established as a requirement for welders to achieve journeyman status.  (*Id.* ¶¶ 33-35.)  In July 2009, however, the union negotiated with GEA a memorandum of understanding that granted Wertz and three other employees journeyman status effective August, 2009, even though these four employees had not graduated from the apprenticeship program.  (*Id.* ¶

36.)   The memorandum of understanding also provided that any other GEA employees either had to already carry journeyman cards or they would be required to complete the apprenticeship program before the company would recognize them as journeymen.  (*Id.* ¶ 37.)  In recognition of his status as a journeyman, Wertz received a pay increase to $20.50 per hour.  (*Id.* ¶ 38.)

Wertz dropped out of the apprenticeship program in or around February 2010.  According to the parties' various submissions, Wertz elected to abandon the program after it was extended to four years, during which time Wertz would be ineligible for any further raises.  Wertz also claims he was frustrated because his intellectual disability, which affects his reading ability, was interfering with his performance.    He claims that he approached Brubaker to request an accommodation or other assistance with his disability that would have helped him, but was denied and treated disrespectfully by her.  (*Id.* ¶¶ 41-42.)  Despite removing himself from the apprenticeship program, however, Wertz's status as a journeyman with GEA was unaffected.  (*Id.* ¶ 43.)

Journeyman welders at GEA make more money than other welders at the company.  This is due, in part, to the increased demands and expectations that come with this advanced job.  Some of the essential job functions of a journeyman welder's job include reading and interpreting blueprints and work orders and observing all safety and quality rules and regulations, although Wertz disputes that

"reading" in general is an essential function of the job.  Instead, Wertz agrees that reading blueprints and work orders accurately is critical, but he disagrees that all facets of reading were equally important or essential to the ability to serve as a journeyman.  (*Id.* ¶¶ 46-47.)

The parties agree that journeymen welders were required to weld in conformance with applicable safety and quality standards, but they disagree about whether journeyman welders were required to have specific knowledge of the texts of the ASME, CE, PED, and UL codes that governed their work.  (Compare Def. SMF ¶48 with Pl. SMF ¶48.)

The parties disagree about the extent of Wertz's reading disability, and the extent to which it impacts his ability to perform the functions of a journeyman welder's job.  Indeed, this dispute lies at the heart of Wertz's ADA discrimination claim.  Wertz admits that he has some significant difficulty reading certain words on some blueprint documents and other technical materials, but he denies the assertion that he is unable to read an entire blueprint or is incapable of understanding critical written information.  Likewise, the parties disagree about the extent of Wertz's inability to read and comprehend language in various industry codes such as ASME, with the defendants claiming that Wertz cannot read it at all, and Wertz asserting that he could read it with assistance, and further noting that he had considerable knowledge and understanding of code safety content and industry

standards.  (*Id.* ¶¶ 53-54.)   Wertz maintains that his reading disability never affected his ability to produce satisfactory welds.  (*Id.*)

Wertz claims that beginning in 2009, he made GEA management aware of some of his reading challenges, including requesting assistance or accommodation, but that this was denied.  GEA, in contrast, maintains that Wertz never made anyone aware that he had a disability, but only told Marilyn Brubaker that he had difficulty reading his apprenticeship coursework.  (Compare Def. SMF ¶¶ 57-58 with Pl. ¶¶57-58.) The record reflects sharp disagreement about the extent to which Wertz communicated with Brubaker and others about his reading difficulties, and about GEA's response.  (*Id.* and Pl. SMF ¶ 59.)  The parties further disagree about who at GEA was aware that Wertz had trouble reading, with GEA suggesting that only Brubaker knew he had some limitations, whereas Wertz points to contrary evidence suggesting that the issue was known by several people including management.  (Compare Def. SMF ¶ 60 with Pl. SMF ¶ 60.)

In addition to having some limitations with his reading and what is apparently an IQ that was assessed during this litigation as being "low average," Wertz also suffers from irritable bowel syndrome ("IBS"), which affected him before he started working with GEA.  In March 2010, Wertz took several days off work to cope with his IBS, after which Marilynn Brubaker offered for him to use FMLA time.  (Parties' SMF ¶¶ 68.)  Thereafter in 2010, Wertz again used FMLA

for further IBS flare-ups, and later to help care for his wife, Susan, who had back surgery that year.  (*Id.* ¶69.)  It appears that Wertz had little trouble using FMLA during this time, though he claims to have encountered some harassment from workers when he did.  Nevertheless, Delaronde and Brubaker became skeptical of Wertz's use of FMLA, with Delaronde testifying that one time he believed he heard slot machines in the background on a day that Wertz called in sick, and with Brubaker questioned him about potential FMLA abuse in March 2011.  (*Id.* ¶¶ 72-73.)  Around this time, Wertz was inquiring about using FMLA because his wife had just been diagnosed with multiple sclerosis.  (Pl. SMF ¶ 73.)  Wertz claims that when he asked Brubaker for FMLA paperwork, she not only questioned his use of it, but refused to provide him with the forms.  (*Id.*)

In or around March of 2011, Wertz spoke to Marilynn Brubaker in GEA's Human Resources division about taking FMLA leave to help care for his wife, who had been diagnosed with multiple sclerosis.  According to Wertz and documents he has submitted, Brubaker initially denied the requested leave and only relented after Wertz complained that she was violating the law.  (Pl. SMF ¶ 73.)  In response, Brubaker threatened to remove Wertz from his welding position – something that he claims happened upon his return.  At that time, Wertz claims that his supervisor, Bob DeLaRonde reassigned him to "dejigging" duty, after Brubaker informed him that he could move employees around following FMLA leave so long as he left

their pay unchanged.   Wertz contends that moving him to "dejigging," which involves pulling product from furnaces and disassembling tooling from the units, is unskilled work that can be performed by anyone.  (Pl. SMF ¶ 17.) Wertz contends that he became upset about the reassignment and told his union representative, Tim Ambrose, that he was going to file a complaint with the Department of Labor. Wertz asserts that after learning of this from Ambrose, Brubaker personally called the DOL and told them that Wertz would be returned to his prior duties, which he claims happened the next week with his supervisor, Bob Delaronde, rudely telling him to "take his fucking shit" back to his work area.  (*Id.*)

In November 2011, the defendants became concerned about Wertz's potential FMLA abuse and began requiring Wertz to fill out questionnaires and obtain additional medical information from his doctor, something that Wertz found not to be interactive in nature but rather intended to discourage him from exercising his lawful rights.  (*Id.* ¶¶74-75.)  Review of the factual record reveals a substantial disagreement regarding the parties' interactions in late 2011 regarding Wertz's attempts to use FMLA, and his actual use of FMLA leave.  (*Id.*)  Wertz continued to take FMLA in 2012, though he was absent for fewer days that year. (*Id.* ¶78.)

In terms of Wertz's job performance, the record is mixed.  In January 2008, Wertz's performance review included a note that he needed to focus more on job

tasks and productivity, and spend less time socializing with co-workers.  As Wertz notes, however, less than a year later, with no additional on-the-job coaching, Wertz was judged to be proficient in the areas of safety, quality, quantity, working with others, and contributions.  At this time, GEA gave Wertz a "Key Contributor" performance score for both protection of assets and technical competence.  In this same review, with respect to technical competence, Wertz's "knowledge and skills [we]re very good."  (Pl. SMF ¶ 79, Ex. TT, Performance Evaluation 2008 at GEA 193-198.)

Reviews of Wertz's work in 2009 are similarly mixed.  GEA highlights the fact that in January of that year Wertz received "performance coaching" because he had failed to produce a quality product due to some inattentiveness to a shop drawing; and in October 2009, he received another performance coaching because he had failed a welding test necessary for him to maintain his ASME licensing.  (Def. SMF ¶¶80-81.)  Wertz points to other evidence during this time which shows that during the same January 2009 evaluation, Wertz was adjudged to be overall proficient in protection of assets, quality, quantity, technical competence, working with others, attendance, and contributions to continuous improvement.  He also received a "Key Contributor" score for his performance in the area of safety.  (Pl. SMF ¶ 80.)  As Wertz also notes, this evaluation was prepared prior to the time that Wertz first began to take FMLA leave in 2010.

10

Wertz's supervisor, Bob Delaronde, also noted in November 2010 that Wertz "need[ed] to work on welding skills and rated him as underperforming, though Wertz contends that this also followed Delaronde's growing irritation with Wertz for using FMLA, something that Wertz maintains influenced Delaronde's evaluation of him.   Wertz also received another "performance coaching" in October 2012.  (Parties' SMF ¶ 82-83.)

In the wake of performance reviews that contained both positive and negative assessments, in the fall of 2012, Wertz applied for a Cell Leader position. Wertz and one other candidate, Bill Kerr, were interviewed for the job, and it was offered to Kerr.  Wertz believed he was more qualified, and he took the issue to the union.  In November 2012, Wertz met with two members of GEA management and with Tim Ambrose, his union committeeman, to discuss the selection of Kerr.  (*Id.* ¶¶89-90.)  After the meeting Wertz filed a grievance with the union claiming that he felt "harassed" and had a "fear of retaliation" for filing a previous grievance related to the Cell Leader job.  (*Id.* ¶ 92.)

After Wertz was passed over for the Cell Leader position, he was angry. GEA contends that during this time Wertz was discussing his frustration with other production employees, though Wertz disputes this and claims he only complained to union representatives.   Approximately a month later, on December 5, 2012, Wertz received a five-year service award for his time with the company.  (*Id.* ¶ 95.)

11

A rumor began circulating that Wertz had thrown his award in the trash and that it was recovered by an employee named Tony Brown.  (*Id.* ¶ 96.)  In response, GEA suspended Wertz's employment pending an investigation.  (*Id.* ¶ 97.)  Wertz points to evidence that calls into question whether any GEA supervisory employee or manager other than Delaronde had any recollection of the suspension or its reason. (Pl. SMF ¶ 97.)

GEA undertook an investigation into concerns that Wertz was a disgruntled employee who had been complaining to other employees, impacting their productivity, and demonstrating a deteriorating attitude in the workplace.  (Def. SMF ¶ 102.)  Following the investigation, which included review of Wertz's personnel file, Wertz was terminated for being disgruntled, exhibiting "overall poor performance," and failing to improve in "certain key areas" over the prior year.  (Def. SMF ¶ 107.)  GEA states only that "management" made this decision, whereas Wertz insists that it was the result of a recommendation by Brubaker and Delaronde.  Wertz points to conflicting testimony as to who was responsible for the ultimate decision to fire him, and notes that both Brubaker and Delaronde has input into the decision.  (Parties' SMF ¶ 105.)  Wertz also cites to evidence disputing that his performance with GEA had been deficient, noting that in a number of instances and areas his work had been deemed to be proficient or better. Moreover, Wertz cites to a variety of evidence that he believes casts doubt on the

reasons given for his termination, including the fact that he received regular raises, had been encouraged to apply for the Cell Leader position because he was qualified, and had not been disruptive.  Wertz also argues throughout his papers that Brubaker's and Delaronde's animosity towards him had grown after he began using FMLA to address his and his wife's medical issues.

Following Wertz's termination, the union filed a grievance protesting the decision.  That grievance was silent as to any allegation that the termination had been retaliatory or discriminatory.  GEA denied the grievance and the union declined to pursue it to arbitration.  On June 6, 2013, Wertz filed a Charge of Discrimination with the EEOC, alleging disability discrimination and retaliation based on his termination.  Wertz filed this action on October 14, 2014, alleging FMLA retaliation, disability discrimination under the ADA and the PHRA, and disability retaliation under both the ADA and PHRA.  (Doc. 1.)  The defendants filed the instant motion for summary judgment on April 14, 2016, and it was referred to the undersigned for preparation of a report and recommendation on October 11, 2016.  (Doc. 71.)

## III.   <u>STANDARD OF REVIEW</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides as  follows:

> A party may move for summary judgment, identifying
> each claim or defense – or the part of each claim or
> defense – on which summary judgment is sought.  The

> court shall grant summary judgment if the movant shows
> that there is no genuine dispute as to any material fact
> and the movant is entitled to judgment as a matter of law.
> The court should state on the record the reasons for
> granting or denying the motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its

existence of nonexistence might affect the outcome of the suit under the applicable

substantive law.  *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d

408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)).  For an issue to be genuine, "all that is required is that sufficient

evidence supporting the claimed factual dispute be shown to require a jury or judge

to resolve the parties' differing versions of the truth at trial."  *Id.* (quoting

*Anderson*, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving

party must show that if the evidence of record were reduced to admissible evidence

in court, it would be insufficient to allow the non-moving party to carry its burden

of proof.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  Provided the moving

party has satisfied this burden, "its opponent must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550

U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-

moving party must then respond by identifying specific facts, supported by

evidence, which show a genuine issue for trial, and may not rely upon the

14

allegations or denials of its pleadings.  *See Martin v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007); *see also* Fed. R. Civ. P. 56 (c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, *Anderson*, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  *Id.*   Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  *Id.* at 252; *see also Big Apple BMW*, 974 F.2d at 1363.  In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant.  In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

15

*Id.*  In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); *NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011).

## IV.   **DISCUSSION**

### A.   **Discrimination**

Wertz claims that GEA's decision to offer the Cell Leader position to another applicant with less experience, and its decision to terminate him, were discriminatory decisions taken because of his physical and intellectual disabilities. The defendants argue that Wertz cannot even make out a prima facie case to support these claims.

The purpose of the ADA is to "prevent employment discrimination of qualified individuals on account of their disability."  *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 512 (E.D. Pa. 2012) (citing 42 U.S.C. § 12112(a)).  The Act requires employers to make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability, unless the employer demonstrates that such accommodations would impose an undue hardship in the operation of their business."  *Id.* (quoting

*Fleck v. WILMAC, Corp.*, No. 10-5562, 2011 U.S. Dist. LEXIS 54039, at *10 (E.D. Pa. May 19, 2011)).

In order to make out a *prima facie* claim for workplace discrimination under the ADA, a plaintiff must demonstrate that he is (1) disabled within the meaning of the ADA, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) has suffered an adverse employment decision as a result of the discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010); see *also Stadtmiller v. UPMC Health Plan, Inc.*, 491 F. App'x 334, 336 (3d Cir. 2012); *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998).   The same standards govern in cases alleging discrimination under the PHRA.  *Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 835-36 (3d Cir. 2015) ("The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds.") (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)).

If the plaintiff makes a *prima facie* showing under this three-part standard, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  *Id.*  If a legitimate, nondiscriminatory reason is given, then the plaintiff must present evidence to demonstrate that the

defendant's reasons were pretext for its unlawful action.  *Id.*  The plaintiff may meet this burden by identifying evidence that allows a factfinder either to disbelieve the employer's articulated legitimate justification, or to conclude that an invidious discriminatory reason was more likely than not a "but for" cause of the employment action.  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The ADA was substantially amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (as codified in provisions of 42 U.S.C. §§ 12101 et seq.), which became effective as of January 1, 2009, and therefore the amendments to the ADA area applicable to this case.  In passing the amendments to the legislation, "Congress has made clear that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.  Indeed, Congress has instructed that in construing the definition of 'disability' under the ADA, it shall be construed in favor of broad coverage of individuals under the ADA, to the maximum extent permitted by the terms of the [ADA]."  *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 690 (W.D. Pa. 2014 (internal citations and quotations omitted).  Congress's purpose in amending the ADA was to "reinstat[e] a broad scope of protection" under the ADA.  Pub. L. No. 110-325, 122 Stat. 3553 § 2(b).  Under this statutory mandate, the Equal Employment Opportunity Commission ("EEOC") revised its implementing regulations to define disability "broadly in favor of expansive

coverage to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.1(c)(4). Review of the definitions provided by the Act and its implementing regulations make clear the expansive reach of the statute's protections.

Under the ADAAA, to qualify as disabled, a plaintiff must prove one of the following: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(1). The ADA defines "disability", in pertinent part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). "Major life activities" include functions such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). In determining examples of major life activities, the regulations provide that the term "major" shall not be interpreted to create a "demanding standard" for disability. *Id.* § 1630.2(i)(2).

With respect to major life activities, the regulations provide that the term "substantially limits" shall be defined broadly in favor of expansive coverage, to "the maximum extent permitted by the terms of the ADA" and also is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). An impairment is

considered a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* § 1630.2(j)(1)(ii). However, an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting," *Id.*, although "not every impairment will constitute a disability[.]" *Id.* The thrust of the ADAAA and its implementing regulations thus call for broad coverage and consideration of an individual's own particular circumstances in determining whether that individual is suffers from a disability within the meaning of the Act.

In this case, GEA does not really dispute that Wertz has a qualifying disability. Instead, the defendants argue that he cannot satisfy the second and third prong of the *McDonnell Douglas* test. First, the defendants argue that because his reading disability was severe, he was unqualified to perform the essential functions of a journeyman welder with or without reasonable accommodation. Second, the defendants argue that GEA had no idea that Wertz had an intellectual disability, and there is no evidence to show that his IBS played any role in GEA's decision to terminate his employment.

With respect to the first argument, to which the defendants devote the majority of their brief, the Court is not persuaded. The defendants, freshly equipped with evidence showing that Wertz's reading ability was far lower than

any of them knew, now argue that Wertz was in fact unqualified for the very job that he had been doing for several years, often receiving proficient scores and special recognition for his contributions to the work of his team.  The defendants would have the Court disregard the fact that Wertz had been promoted to the journeyman position more than three years before he was eventually terminated, and the fact that there is evidence showing that he has been reading and working with welding blueprints and other trade documents for years, apparently without issue.  Nevertheless, the defendants argue that the Court should disregard this ambiguity in the factual record and conclude as a matter of law that Wertz was never qualified to perform the work that he had done for years.  This conclusion is not compelled by the record, and questions regarding Wertz's qualifications and the extent of his reading deficiency should be committed to a factfinder at trial.

With respect to his irritable bowel syndrome (IBS), the record is undisputed that GEA knew about his condition for at least three years before Wertz was terminated.  The Court has been presented with relatively little in the record to suggest that the fact of Wertz's IBS factored into any employment decisions made during this time, let alone the company's ultimate termination to terminate his employment in December 2012.  Indeed, the record shows that Wertz sought, and used, FMLA to help cope with IBS flare-ups beginning in 2010.  However, Wertz and the defendants have different interpretations regarding the company's

treatment of Wertz after he had used FMLA on multiple occasions, with Wertz claiming that he was removed from his work as a welder, and that he faced antagonism from some supervisors upon his return, particularly in 2011.

In some ways the dispute seems to be less about the company's discriminatory animus towards a physical disability that arose episodically, and more with Brubaker's and Delaronde's skepticism over Wertz's FMLA use generally. However, at this stage of the proceedings, the finds that Wertz has presented evidence that although GEA initially seemed accommodating of his FMLA use to treat his own medical issues, GEA began to question his FMLA use and took steps to make this use more onerous. To be sure, GEA has disputed this interpretation of the facts and is adamant that the company did no more than attempt to work with Wertz to see whether his IBS could be better accommodated. What GEA interprets as an effort to engage in an interactive process with an employee, Wertz sees as a deliberate attempt to discourage him from taking leave to treat a serious medical issue, and as an indication of the company's hostility to a serious medical condition. Wertz also used FMLA to address a disabling condition approximately six weeks prior to his termination, something that the parties interpret in starkly different ways, with GEA contending that this leave was so remote in time that it could not have had any bearing on the decision to fire Wertz,

whereas Wertz presents it as a part of an overall picture of growing hostility to his disabilities and efforts to manage them.

In contrast to his IBS, Wertz's reading disability has dominated the parties' briefing in this case.  GEA insists that nobody within the company had any idea that Wertz had a problem with reading, and no reason to believe that he had any sort of intellectual disability.  However, this is not an entirely accurate picture of the evidence in the record.  There is some evidence that Marilynn Brubaker had direct knowledge of Wertz's difficulty reading, and she was made aware of this shortly after Wertz began the apprenticeship program in 2009, more than three years before he was fired.  (Pl. SMF ¶ 57.)  Indeed, Wertz claims that he asked Brubaker multiple times for assistance with his reading disability, but that she refused to accommodate him and was openly disrespectful to him when he raised the issue.  (*Id.* and ¶ 42.)  Likewise, Wertz attests that he informed union officials about his reading difficulties, and that these union officials made GEA's human resources officials aware of the issue.

There is also some evidence that Wertz complained to both Brubaker and Delaronde in December 2012, very shortly before he was terminated, that he believed he had not gotten the Cell Leader job because of his reading disability.  Likewise, Wertz has pointed to evidence which indicates that other GEA personnel were also aware of his difficulty reading, and were present during a meeting when

Wertz told his supervisor that his reading issues contributed to his decision to withdraw from the apprenticeship program.

The Court finds that the evidence showing that GEA was made aware of Wertz's physical and intellectual disabilities, and the evidence which Wertz claims shows GEA was at times indifferent to his disability and requests for accommodation, as well as antagonistic to his legitimate use of FMLA to address his medical needs, is sufficient evidence to create a triable issue on causation. To be sure, we have interpreted the evidence in the light most favorable to Wertz as the non-moving party, and recognize that GEA has presented considerable evidence to cast doubt on Wertz's claims and to support the company's version of events and employment decisions. Nevertheless, although Wertz's evidence is somewhat limited, and although GEA may have strong factual defenses to the claim, including its assertions that there were no reasonable accommodations available to Wertz and that Wertz's disabilities had nothing to do with the company's decision to terminate his employment, the parties have presented competing factual narratives and evidence regarding, these disputed issues make summary judgment inappropriate *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (noting that the non-moving party need not match, "item for item, each piece of evidence proffered by the movant[,]" and that if the non-movant has presented more than a scintilla and offered a genuine

issue of material fact, the court cannot credit the movant's version of events, even if the quantity of that evidence outweighs that offered by the non-movant).

GEA has responded to the plaintiff's prima facie showing by arguing that that the company had legitimate, non-discriminatory and non-retaliatory reasons for terminating Wertz's employment.  In this regard, GEA argues that Wertz was terminated for allegedly disruptive behavior in 2012, overall poor performance, and failure to improve in "certain key areas".  Wertz has responded to this showing by pointing to evidence in the record that he contends creates a genuine issue of dispute, and would permit a factfinder to conclude that GEA's proffered legitimate reasons are pretext.  In this regard, Wertz points to evidence showing that he had gotten many positive and favorable reviews, and that his overall work was in many respects deemed to be proficient.  He argues that the allegation that he was disruptive for throwing away a service award was the product of a sham investigation during which neither he nor the other employee who picked up the award were interviewed.  (Pl. SMF ¶105.)  Review of the parties' submissions demonstrates that the evidence regarding the defendants' proffered reasons, and Wertz's assertions of pretext, is in conflict and should be committed to a factfinder for consideration and resolution.

For all of these reasons, it will be recommended that the defendants' motion be denied with respect to Wertz's claims for disability discrimination in Counts II and IV of the complaint.

### B.   Retaliation

Wertz has also claimed that the defendants retaliated against him for exercising rights protected by the FMLA and the ADA.

The ADA provides that "No person shall discriminate against any individual because such individual has opposed an act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).   Accordingly, "it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).   Although requesting a reasonable accommodation does not appear to "fit[ ] within the literal language of the statute," *Soileau v. Guildford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997), the Third Circuit has held that making a good-faith request for accommodation is protected activity for purposes of the ADA's anti-retaliation provision, *see Shellenberger*, 318 F.3d at 191.

In order to make out a prima facie case of illegal retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity,

and (3) a causal relationship between the protected activity and the adverse action."
*Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004);
*Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002). The burden-shifting framework of *McDonnell Douglas*, summarized above, also applies to ADA retaliation claims. In all cases involving retaliation, a plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of the process. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997). The ultimate burden always remains with the plaintiff. *Id.*

The Third Circuit has summarized the showing that a defendant must make in order to obtain summary judgment on a claim of ADA retaliation:

> [T]he employer must show that the trier of fact could not conclude, as a matter of law, (1) that retaliatory animus played a role in the decisionmaking process and (2) that it had a determinative effect on the outcome of that process. This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to either: (1) one of more elements of the plaintiff's prima facie case or, (2) if the employer offers a legitimate non-retaliatory reason for the adverse employment action, whether the employer's proffered explanation was a pretext for retaliation.

*Id.*

In many cases, assessment of a retaliation claim will be focused on the third step, i.e., whether a causal relationship can be demonstrated. *Williams*, 380 F.3d at

759 n. 3.  Such is the case here, where there is evidence to show that the plaintiff engaged in protected activity under the ADA, and was ultimately subject to adverse employment action both by being denied a promotion and later being suspended and terminated.  The question is thus whether the plaintiff has sufficient evidence to show that a causal relationship exists between the protected activity and the adverse action.

The FMLA's prohibition against retaliation, in turn, is found in the Act's regulations.  Specifically, 29 C.F.R. § 825.220(c) provides:

> An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

See also Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004) (citing to the regulation and observing that FMLA retaliation claims arise under 29 U.S.C. § 2615(a), the interference provision of the FMLA).  To be successful on an FMLA retaliation claim, a plaintiff must show that (1) he took FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse

decision was causally related to his leave or exercise of rights protected by the Act.
*Id.*

In this case, there is no dispute that Wertz exercised rights protected under the FMLA when he took leave to address his own IBS at various times throughout his employment, and to help care for his wife during periods of 2010 and 2011. There is also, apparently, no dispute that Wertz used FMLA less than two months before he was fired.  Likewise, Wertz has presented at least some evidence to suggest that he engaged in activity protected under the ADA, that he sought accommodation, and that he complained to management that he was denied the Cell Leader promotion because of a disability.  There is also no dispute that Wertz suffered adverse action when he was denied the promotion and shortly thereafter when he was terminated in December 2012.  The claim, therefore, boils down to whether Wertz can show that the adverse employment actions of failing to promote him and firing him were causally related to his FMLA use or exercise of activity protected by the ADA.  *Conoshenti*, 364 F.3d at 146; *Shellenberger*, 318 F.3d at 188, 191; *Mascioli v. Arby's Restaurant Group, Inc.*, 610 F. Supp. 2d 419, 434 (W.D. Pa. 2009).

There are two factors that courts focus on when considering whether a causal link exists between adverse employment action and protected activity:  (1) timing or (2) evidence of ongoing antagonism.  *See Abramson v. William Paterson*

*College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link.  [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

Wertz has presented some evidence to show that both of these relevant factors were in play.  Reading the evidence in Wertz's favor, he has pointed to facts that might allow a factfinder to conclude that Brubaker and Delaronde developed a growing frustration with Wertz's use of FMLA, particularly in 2011.  In this regard, Wertz claims that in March 2011, Brubaker initially denied Wertz's request to take leave to care for his wife following her MS diagnosis, and even threatened to have him removed from his welding position, but relented when he complained that what she was doing was unlawful.  (Pl. SMF ¶ 17.)  Wertz also attests that Delaronde's antagonism can be seen in the fact that he reassigned Wertz to "dejigging" work after his return from leave, and took him off of welding jobs until Wertz threatened to make a legal issue out of it.  (*Id.*)

Wertz also claims that he complained to both Brubaker and Delaronde about his feeling that his difficulty with reading and his use of FMLA had influenced the company's decision to pass him over for the Cell Leader position – complaints that he made just days before he was terminated, and a few weeks after his final use of FMLA leave.  GEA vigorously disputes Wertz's characterization of this evidence,

and is adamant that it is insufficient as a matter of law to support a claim for retaliation, but like Wertz's discrimination claim, this issue is rife with disputes. The Third Circuit's jurisprudence in this field cautions that where there are factual disputes bearing on the issue of causation, those factors may require resolution by a factfinder and may be incapable of a simple assessment or calculation of time alone between protected activity and adverse action.

"The mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997) abrogated on other grounds by *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006).  However, the Third Circuit has also clarified that if the timing of the retaliatory action is " 'unusually suggestive' of retaliatory motive" a causal link may be inferred. *Krouse*, 126 F.3d at 503 (citing *Robinson*, 120 F.3d at 1302).  In some cases, the appeals court has found a period of two days demonstrated a causal link, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989), but has found that a period of two months was not, *see Williams*, 380 F.3d at 760.

The law in this field is somewhat unclear, and the Third Circuit has also noted that there is some contradiction in the court's own jurisprudence about the probative value of proximity in retaliation cases, remarking that the case law is " '

seemingly split' as to whether temporal proximity between a protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of causal connection for purposes of a prima facie case of retaliation." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). The court nevertheless cautioned that the apparent inconsistency in the court's analysis is "not an inconsistency . . . but is essentially fact-based." Thus, the court has "ruled differently on this issue . . . depending, of course, on how proximate the events actually were, and the context in which the issue came before us." *Id.* In undertaking such a fact-based inquiry, the court noted that case law sets "no limits on what we have been willing to consider" in order to evaluate whether there is a sufficient showing of causation to support a retaliation claim.

This expansive approach to considering relevant evidence in these types of employment cases counsels caution here. The evidence of temporal causation is thin in this case, and seems to rest on Wertz's claim that he complained to both Brubaker and Delaronde that he believed his disabilities and use of FMLA led to him being denied the Cell Leader promotion, which days later led to his firing. But although this may be a spare showing upon which to predicate an inference of causation, there is other potentially relevant evidence that bears on this issue, including Wertz's contention that starting in 2011 and going forward, he

experienced periods of antagonism at work after he availed himself of FMLA leave to care for himself and his wife.

As has been noted, this evidence includes Wertz's claim that shortly after he began taking FMLA leave, Brubaker initially tried to deny him further leave to care for his wife and only relented after Wertz complained that he had a legal right to the leave. Shortly after he returned from this leave, Wertz claims he was subject to a reassignment to a less favorable position and removed from welding work until he complained to the union, which may have led to friction with Delaronde. Wertz claims that after tension arose regarding his use of FMLA, and continuing into 2012, his employment reviews began to suffer for reasons that he disputes. Additionally, Wertz has suggested that the reasons that have been offered for his firing are flimsy, based on a shoddy investigation into allegations that he was a disgruntled employee, and were based on vague assertions that he had failed to improve in unspecified "key areas," whereas a review of his overall employment record with GEA suggested that he had, in fact, performed relatively well and had even received recognition for his work.

As is the case with Wertz's discrimination claims, the Court need not examine each of these factual issues, or seek to resolve them. Indeed, this is precisely what the Court is enjoined from doing when evaluating a motion for summary judgment. Having found that Wertz has met his burden of coming

forward with evidence sufficient to dispute GEA's factual assertions regarding his discrimination and retaliation claims in this case, it is recommended that the defendants' motion for summary judgment be denied, and the case set for trial.

## V.   **RECOMMENDATION**

Accordingly, for the foregoing reasons, it is RECOMMENDED that the defendants' motion for summary judgment (Doc. 53) be DENIED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 29th day of December, 2016.

/s/  Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

34